1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                        SOUTHERN DISTRICT OF CALIFORNIA

10   DONALD EUGENE MITCHELL,                  Civil No.   10-CV-963-JAH (POR)

11                              Petitioner,   **REPORT AND RECOMMENDATION**
                                              **DENYING MOTION TO DISMISS**
12              v.

13   MATTHEW MARTEL, Warden,                  **[ECF No. 23]**

14                              Respondent.

15                             **I. INTRODUCTION**

16          On May 3, 2010, Petitioner Donald Eugene Mitchell ("Petitioner"), a prisoner proceeding

17   *pro se*, filed a Petition for Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254, alleging

18   (1) ineffective assistance of counsel, and (2) denial of a mental competency hearing.  (ECF No. 1.)

19          On August 3, 2011, Respondent filed a Motion to Dismiss the Petition asserting it is time

20   barred pursuant to 28 U.S.C. § 2244(d).  (ECF No. 23.)  Although Respondent concedes Petitioner

21   has suffered from severe mental illness, Respondent contends Petitioner's condition was stable for a

22   majority of the pertinent time period so that equitable tolling is not warranted.  (ECF No. 23-1.)  In

23   addition to being untimely, Respondent also contends Petitioner's claims are procedurally defaulted.

24   *Id.* at 5.

25          In his First Amended Response in Opposition to the Motion to Dismiss, Petitioner contends

26   equitable tolling is warranted and his claims are not procedurally defaulted because *Martin v.*

27   *Walker*, __ U.S.__, 131 S. Ct. 1120 (2011) is not controlling.  (ECF No. 40.)

28   ///

                                      - 1 -                        10cv963-JAH (POR)

1   After thorough review of the Petition, Respondent's Motion to Dismiss, Petitioner's

2   Opposition, and all supporting documents, and in accordance with Local Rule 72.1(d), this Court

3   RECOMMENDS that Respondent's Motion to Dismiss be **DENIED**.

4   **II. PROCEDURAL BACKGROUND**

5   On April 18, 1997, a jury convicted Petitioner of false imprisonment by violence.

6   (Lodgment 1 at 63.)  Thereafter, the trial court determined Petitioner had previously been convicted

7   of three crimes that qualified him for sentencing under the Three Strikes law and had served a prison

8   term.  The court imposed a sentence of imprisonment for twenty-five years to life.  *Id.* at 112.

9   On December 23, 1997, Petitioner appealed, contending (1) the trial court abused its

10   discretion in precluding defense impeachment of the victim with evidence of a prior misdemeanor

11   conviction for prostitution, and (2) the sentence under the Three Strike law was cruel and unusual.

12   (Lodgment 3.)  On July 24, 1998, the California Court of Appeal denied the appeal.  (Lodgment 6.)

13   On August 7, 1998, Petitioner filed a petition for review in the California Supreme Court

14   challenging his sentence.  (Lodgment 7.)  On September 30, 1998, the California Supreme Court

15   denied review.  (Lodgment 8.)  Petitioner did not seek certiorari from the United States Supreme

16   Court.

17   On October 16, 2009, Petitioner filed a petition for writ of habeas corpus in the California

18   Supreme Court.  (Lodgment 9)  In this petition, Petitioner claimed his defense counsel was

19   ineffective in failing to investigate the victim's record of prostitution or to investigate Petitioner's

20   mental competence.  *Id.* at 3.  On April 14, 2010, the California Supreme Court denied the petition

21   without comment, but with citations indicating it determined Mitchell's claims to be untimely.

22   (Lodgment 10 (citing *In re Robbins*, 18 Cal. 4th 770, 780, 959 P.2d 311, 77 Cal. Rptr. 153 (1998)).

23   On May 3, 2010, Petitioner filed the Petition now before this Court.  (Doc. 1.)  Petitioner

24   alleges: (1) ineffective assistance of counsel; and (2) denial of a mental competency hearing.  *Id.* at

25   5.

26   On August 17, 2010, Respondent filed a Motion to Dismiss, contending the Petition was

27   untimely and Petitioner did not qualify for equitable tolling.  (ECF No. 9.)

28   This Court issued a Report and Recommendation, making the following findings: (1)

1  Petitioner's conviction became final on December 29, 1998; (2) that no later start date applied, so

2  Petitioner had one year from that date to file a timely federal petition, unless the date was extended

3  by tolling; and (3) there was no basis for statutory tolling.  (ECF No. 13.)  However, the Court

4  concluded the record was not developed sufficiently to reject the application of equitable tolling.  *Id.*

5  Accordingly, the Court recommended Respondent expand the record by lodging documents

6  regarding Petitioner's mental condition.  *Id.*  On February 16, 2011, District Judge John A. Houston

7  adopted the Report and Recommendation in full.  (ECF No. 14.)

8      On August 2, 2011, after lodging several medical and psychiatric records with the Court,

9  Respondent renewed its Motion to Dismiss, claiming Petitioner does not qualify for a sufficient

10  amount of equitable tolling and that his claims are procedurally defaulted.  (ECF No. 23.)

11      On September 15, 2011, given the evidence of Petitioner's mental impairment, the Court

12  appointed CJA panel attorney Kurt David Hermansen to represent Petitioner.  (ECF No. 35.)

13      On September 16, 2011, Petitioner's jailhouse "lawyer" filed a response in opposition to

14  Respondent's motion to dismiss.  (ECF No. 36.)  On November 7, 2011, Petitioner's counsel filed a

15  First Amended Response in Opposition to the Motion to Dismiss asserting Petitioner is entitled to

16  equitable tolling and his Petition is not procedurally defaulted.  (ECF No. 40.)

17      On November 21, 2011, Respondent filed a Reply.  (ECF No. 42.)

18      On November 26, 2011, Petitioner filed a Response to the Reply.  (ECF No. 43.)

19                          **III. DISCUSSION**

20      **A.      Equitable Tolling[1]**

21      Respondent contends the Petition is untimely because Petitioner's mental impairment did not

22  prevent him from timely filing a petition.  (ECF No. 23-1 at 8-14.)  Specifically, Respondent

23  contends the records show long periods of time during which Petitioner's cognitive functioning was

24  such that equitable tolling does not apply.  *Id.* at 8.

25      In his First Amended Response in Opposition to the Motion to Dismiss, Petitioner contends

26

27  _____

28      [1]  Because the Court has thoroughly addressed the fundamental issues regarding the applicability of the statute of limitations, the date of finality of the state conviction, and the lack of applicability of statutory tolling in its previous Report and Recommendation (ECF No. 13), the current Report and Recommendation will only address the remaining issue of equitable tolling.

1  equitable tolling is warranted because (1) the medical records indicate Petitioner's mental illness

2  rendered him unable to personally prepare a habeas petition and effectuate its filing, and (2)

3  Petitioner was as diligent as possible given his medical impairment.  (ECF No. 40.)  Specifically,

4  Petitioner contends the records show Petitioner consistently suffered from psychotropic medication

5  side effects, severe paranoia, auditory and visual hallucinations, anti-social behavior due to mistrust

6  of others, and moderate to severe impairment in social, occupational, and school functioning from

7  1999 through 2011.  *Id.*  Further, a certified psychologist who has reviewed the pertinent medical

8  records lodged with the Court believes, in his expert opinion, that Mr. Mitchell suffers from low

9  intellectual functioning which affects his abilities to function independently or process legal matters.

10  (ECF No. 40-1.)

11        For the reasons set forth below, the Court concludes the record is adequate to resolve the

12  pending equitable tolling issue without need for additional discovery or an evidentiary hearing and,

13  further, finds the Petition is timely.  Accordingly, the Court RECOMMENDS Respondent's Motion

14  to Dismiss on the basis of timeliness be **DENIED.**

15                    **1.    Law**

16        Generally, before equitable tolling may be considered, a Petitioner must establish two

17  elements: "(1) that he has been pursuing his rights diligently; and (2) that some extraordinary

18  circumstance stood in his way."  *Raspberry v. Garcia*, 448 F.3d 1150, 1153 (9th Cir. 2006).  The

19  mere existence of an "extraordinary circumstance", however,  is not enough to warrant equitable

20  tolling.  A petitioner must also establish a causal connection between the extraordinary circumstance

21  and the federal petition's untimeliness.  *Bryant v. Arizona Att. Gen*, 499 F.3d 1056, 1061 (9th Cir.

22  2007).  A petitioner seeking application of the doctrine bears the burden of showing that it should

23  apply to him.  *Raspberry*, 448 F.3d at 1153.

24        Mental incompetence may equitably toll the statute of limitations.  *Laws v. Lamarque*, 351

25  F.3d 919, 923 (9th Cir 2003); *Calderon v. United States District Court (Kelly)*, 163 F.3d 530, 541

26  (9th Cir. 1998).  "Where a habeas petitioner's mental incompetence in fact caused him to fail to meet

27  the AEDPA filing deadline, his delay was caused by an 'extraordinary circumstance beyond [his]

28  control,' and the deadline should be equitable tolled."  *Laws*, 351 F.3d at 923.

The Supreme Court has not examined or delineated the circumstances under which mental illness will warrant equitable tolling.  However, in *Bills v. Clark*, 628 F.3d 1092 (9th Cir. 2010), the Ninth Circuit recently established the following two-part test for determining a petitioner's eligibility for equitable tolling based on mental impairment:

> (1) *First*, a petitioner must show his mental impairment was an "extraordinary circumstance" beyond his control, [] by demonstrating the impairment was so severe that either
>
> > (a) petitioner was unable rationally or factually to personally understand the need to timely file, or,
> >
> > (b) petitioner's mental state rendered him unable to personally prepare a habeas petition and effectuate its filing.
>
> (2) *Second*, the petitioner must show diligence in pursuing the claims to the extent he could understand them, but that the mental impairment made it impossible to meet the filing deadline under the totality of the circumstances, including reasonably available access to assistance.

*Id.* at 1099-1100.

The first prong of the *Bills* test is satisfied if a petitioner's mental impairment was so severe that it prevented him from understanding the need to timely file a habeas petition or take steps to effectuate that filing, whether personally or through the assistance of others.  *Id.* at 1100.  The second prong of the *Bills* test is a "totality of the circumstances" test, which "considers whether the petitioner's impairment was a but-for cause of any dela*y." Id.*  Moreover, the Court must consider "whether the circumstances demonstrated the petitioner was otherwise diligent in attempting to comply with the filing requirements" and exploiting whatever assistance is "reasonably available." *Id.*

### 2. Petitioner's Medical History

#### a. Medical Records

In Petitioner's medical records spanning over eleven years, it is apparent Petitioner suffers from Schizophrenia, Paranoid type, Bi-Polar Disorder, and Poly-substance Dependence.  (Lodgment 12 at 98.)  Since 1985, Petitioner has suffered from auditory and visual hallucinations, and occasional involuntary muscle spasms.  (Lodgment 15 at 12; Lodgment 13 at 50.)  Petitioner's auditory hallucinations consist of voices, which are not command in nature, but tell Petitioner nonsensical things.  (Lodgment 15 at 12, 23.)  Petitioner's visual hallucinations are "little objects in the corner of his eyes, such as bugs or people."  (Lodgment 15 at 23.)  From March 1999 to February

2011, Petitioner was treated with the following anti-psychotic, anti-depressant, and anti-seizure medications: Haldol; Olanzapine; Thorazine; Cogentin; Artane; Benadryl; Seroquel; Zoloft; Paxil; Risperdal; Depakote; Abilify; and Benztropine.  (Lodgment 11 at 2, 5, 21,24; Lodgment 12 at 10, 91, 113, 182, 186, 196; Lodgment 13 at 207; Lodgment 14 at 322.)

At Petitioner's sentencing hearing in 1997, his mother testified that Petitioner suffered from a brain embolism and had surgery thirteen years earlier for which he received medication and qualified for Social Security assistance.  (Lodgment 2 at 242, 244.)  Further, she testified that Petitioner spent nine months in Patton State Hospital, where he was diagnosed as a paranoid schizophrenic.  *Id.* at 242.  In a sworn declaration attached to Petitioner's First Amended Response in Opposition to Respondent's Motion to Dismiss, Petitioner's mother confirms the accuracy of what she told the state court sentencing judge in 1997.  (ECF No. 40, Exhibit B.)

In the habeas petition filed in the California Supreme Court, Petitioner's jailhouse "lawyer" asserted Petitioner "has mental health issues and still suffers from them.  Petitioner suffers from lapses of consciousness [and] memory, paranoi[d] schizophrenia and Petitioner is diagnosed with [a] mental disorder."  (Lodgment 9 at 3.)  In his *pro se* Opposition to the current Motion to Dismiss, Petitioner's jailhouse "lawyer" also represented that Petitioner is a participant in the Mental Health Delivery System and receives mental health treatment in prison.  (ECF No. 12 at 10.)

The earliest medical record before the Court is a March 1999 report, in which a clinician noted Petitioner needed to come off the yard because he was running around, manic, with "poor coherence of ideas," while screaming rapidly and being extremely uncooperative.  (Lodgment 12 at 183.)  In April 1999, Petitioner was transferred to another prison and was placed in Enhanced Outpatient Program (EOP), where he took several of the psychotropic medications listed earlier.  (Lodgment 11 at 1; Lodgment 12 at 10.)  Petitioner remained in EOP through 2011, with very few exceptions.

During the months following March 1999, Petitioner's intellectual functioning was noted as within normal limits.  (Lodgment 12 at 85.)  However, Petitioner's voices and delusions persisted and he indicated "people are trying to get me."  *Id.* at 172.  Petitioner also had nightmares and experienced difficulty falling asleep.  *Id.*  In a December 1999 report, it was noted that Petitioner's

1   auditory hallucinations were controlled, but that Petitioner's cognitive skills, insight, and judgment

2   were "impaired," and his general information was "poor/vague," as opposed to within normal limits

3   reported earlier in the year.  *Id.* at 158.

4        In February 2000, Petitioner's cognitive skills were noted as "some/impaired" as opposed to

5   within normal limits.  (Lodgment 12 at 152.)  Although his hallucinations were controlled by his

6   medication, his speech was "pressured/loud" and his insight and judgment were marked as

7   "impaired/poor."  *Id.*  A clinician stated Petitioner suffers from paranoia, mistrust of others, a

8   disorganized thought process, paranoid delusions, and being "socially isolative."  *Id.* at 82.  In April

9   2000, an EOP progress report noted Petitioner's insight was "minimal," his cognition "confused,"

10  and he was easily diverted from the group topic.  *Id.* at 60.  In November 2000, Petitioner's auditory

11  hallucinations remained stable with his medication, but Petitioner continued to exhibit anti-social

12  behavior and suffered from paranoid thoughts, obsessive thoughts about mistrust of others, and a

13  "disorganized thought process."  *Id.* at 124.

14       In January 2001, Petitioner requested to see a psychiatrist to discuss his medication because

15  he felt like he was "going to swallow his tongue and body is locking all over."  (Lodgment 12 at

16  113.)  In February 2001, a clinician indicated Petitioner was really confused/frustrated regarding

17  steps necessary to obtain records for his appeal.  *Id.* at 108.  The clinician stated Petitioner is easily

18  overwhelmed and has real difficulty understanding explanations or recommendations on how to

19  effectively deal with and cope with things as they occur.  *Id.*  In a Suicide Risk Assessment form

20  dated April 6, 2001, a clinician stated Petitioner was not at risk of suicide, despite suffering

21  delusions, hallucinations, depression, poor impulse control, insomnia, and anxiety.  *Id.* at 6.  Later

22  that month, a clinician noted Petitioner was agitated and angry, and had obsessive thoughts which

23  interfered with his daily activities.  *Id.* at 96.  In Progress Notes dating between May 2001 and

24  October 2001, a clinician noted Petitioner actively participated in group therapy sessions, but

25  provided minimal insight.  *Id.* at 37-50.  In December 2001, Petitioner expressed he continued to feel

26  "paranoid' and requested additional medication.  *Id.* at 95.

27       In January 2002, after spending time in administrative segregation where he did not get his

28  medication for two days, a clinician reported Petitioner was anxious and mildly paranoid.

(Lodgment 12 at 93.)  In May 2002, a clinician noted Petitioner was focused on paranoid themes, felt "negative vibes," thought others were taking advantage of him, and felt people were laughing at him.  *Id.* at 91.  At that time, Petitioner accepted medication for anxiety, depression and sleep difficulties.  *Id.*  On June 25, 2002, a clinician noted Petitioner "appears to have residual symptoms of schizophrenia, [and] when stressed becomes paranoid." *Id.* at 90.  In August 2002, a clinician noted Petitioner stated he was "hearing 'more voices' and they had made him quit his job [as a janitor]."  (Lodgment 13 at 207.)  In September 2002, a clinician noted Petitioner had a tendency to "become anxious, stressed, obsessive worrying when his needs, wants or concerns are not immed[iately] resolved."  *Id.* at 206.  Further, EOP progress notes from September indicated Petitioner was "a bit slow," and that he raised tangential comments without knowing he was off topic.  *Id.* at 276.  In November 2002, an EOP progress note stated, "Petitioner continues to try and cope with paranoia & anxiety.  He has not made much more progress in the program but he appears to be maintaining." *Id.* at 37.  The clinician further found Petitioner had poor insight and judgment, but found Petitioner's present mental status was within normal limits.  *Id.*

In February 2003, Petitioner's intellectual functions were noted as within normal limits, but Petitioner continued to cope with paranoia and anxiety.  (Lodgment 11 at 56.)  Although the clinician noted no hallucinations, Petitioner's insight and judgment were noted as "poor."  *Id.*  A May 2003 report revealed the same observations.  *Id.* at 53.  In June 2003, a clinician indicated Petitioner had an impaired thought process, indicating it was "slow."  (Lodgment 13 at 166.)  In September 2003, Dr. Gary Kelley (PhD), indicated he was worried about Petitioner and referred him for a psychiatric/medication evaluation.  (Lodgment 12 at 89.)  In November 2003, Petitioner's cognition was evaluated again as within normal limits, but his insight and judgment were poor.  (Lodgment 11 at 47, 38.) The report also noted minimal coping skills and emotional reactions.  *Id.*

In January 2004, a clinician noted Petitioner's medication was changed because his previous prescription made him paranoid.  (Lodgment 13 at 123.)  Although the clinician concluded Petitioner was within normal limits, the clinician noted Petitioner was paranoid and that he stays away from people.  *Id.*  February 2004 progress notes indicated Petitioner's mood, affect and behavior were within normal limits, but they also reported Petitioner was "dealing with voices" and experiencing

mood swings.  *Id.* at 112-113.  Specifically, a February 4, 2004 EOP Mental Health Treatment Plan stated:

> [Petitioner] has not shown any significant change in the last 90 days.  Same issues, same problems, some paranoia.  Regardless of past experience he does not appear to learn from those experiences nor does he progress.  His ability to go to mainline and successfully program is questionable.  Coping skills are minimal and he reacts emotionally to the same problems time and time again.

*Id.* at 117.  During visits with clinicians in March 2004, Petitioner reported he is "doing good," but "paranoia hits him now and then."  *Id.* at 106-110.  An April 2004 report indicated Petitioner's cognition as within normal limits, but noted insight and judgment to be poor.  (Lodgment 11 at 30, 31.)  In June 2004, a report noted Petitioner had low intellectual functions and cycled in and out of moderate to high levels of paranoia while obsessing over certain issues. *Id.* at 39.  In July 2004, a clinician noted Petitioner's intellectual functions and reality contact were "below average."  *Id.*  His insight and judgment were noted as "limited", and the report indicated Petitioner continued to suffer from delusions and paranoia.  *Id.*  In September 2004, Petitioner is reported stating, "I still hallucinate, even if I don't hear voices, I get the wrong thoughts in my head."  (Lodgment 13 at 72.)  An October 2004 report showed most assessments as within normal limits.  (Lodgment 11 at 37.)  A report from November 2004 noted most cognition categories as within normal limits, but further noted Petitioner's eighth grade education.  *Id.* at 44.

From the beginning of 2005 through November 2005, Petitioner was taken out of EOP and placed in Clinical Case Management, a lesser level of care.  (Lodgment 13 at 10.)  In March 2005, while taking medication, a report noted Petitioner's speech was normal and well-organized, he had no psychotic symptoms, and he exhibited no abnormal movements.  *Id.* at 58.  July progress notes, however, indicate Petitioner felt "drowsy" as a result of his medication and his affect was noted as "anxious." *Id.* at 54-55.  Also, in August 2005, Petitioner's medication was changed because he was experiencing involuntary movements while under his previously prescribed medication.  *Id.* at 50.  A clinician also noted his speech was pressured, he was anxious, he experienced hallucinations and persecutory delusions.  *Id.* at 49-53.  In November 2005, Petitioner was placed back in EOP and continued to suffer from paranoia, anxiety, and depression.  (Lodgment 11 at 31.)  In December 2005, although Petitioner's insight and judgment were noted to be within normal limits, his thought

content was not. (Lodgment 13 at 41.)  In fact, the report indicated Petitioner still suffered from auditory and visual hallucinations such as voices and quoted Petitioner as saying, "my mind still plays tricks on me."  *Id.*

In January 2006, Petitioner's thought content was still noted as not within normal limits, his speech was "pressured," and his insight and judgment were noted as "poor."  (Lodgment 14 at 349.)  At this point, Petitioner attempted to function for several months without medication.  In June 2006, Petitioner was reported stating, "Voices tell me to get in trouble but I ignore them."  *Id.* at 277.  The clinician also noted Petitioner's thought process was "non linear, rambling."  *Id.*  In August 2006, Petitioner expressed anger over the death of his brother, and it was reported he had "poor" judgment. *Id.* at 344.  In October 2006, Petitioner continued to report hearing voices. *Id.* at 343.  In a report from November 2006, it was noted that Petitioner was "rambling on religious themes," "slow," inappropriately laughing, and exhibited poor insight and judgment. *Id.* at 58.  On December 5, 2006, a psychiatrist stated Petitioner seemed to be "psychotic. [He] believes in angels, [the] devil. [Petitioner] needs antipsychotic medication." *Id.* at 340.

In February 2007, after being prescribed Zoloft, Risperdal and Cogentin, Petitioner was speaking incoherently, expressing bizarre thoughts, and unable to sit or pay attention. (Lodgment 14 at 6.)  In April and May 2007, Petitioner refused his medications.  *Id.* at 7-9.  In July 2007, Petitioner indicated his medications made him shake and induced paranoia.  *Id.* at 331. Although a clinician found Petitioner to be within normal limits in a November 2007 report, the clinician also noted Petitioner was agitated, "slightly bizarre," "manic," and his insight and judgment were poor.  *Id.* at 55.  The clinician also stated Petitioner was "slow, but reads okay."  *Id.* at 58.  Another report from late 2007 described Petitioner as "confused."  *Id.* at 326-327.  On December 31, 2007, during an appointment with a clinician, Petitioner became very loud and angry and started rambling and threatening people from his past. *Id.* at 326.

In January 2008, a Captain requested an emergency referral for Interdisciplinary Treatment Team (IDTT) due to bizarre behavior.  (Lodgment 14 at 52.)  Despite the fact that Petitioner was on his medication, Petitioner was constantly yelling disrespectful racial/gang epithets and sexual comments, such as "f*** the Bloods [and] the Crips" and "I ain't no rapist, I don't pull out my

dick..” *Id.* Petitioner was agitated and hyper-verbal, talking loudly and refusing to stop talking. *Id.* at 53.  Petitioner's intellectual functioning was reported as within normal limits, while his concentration and attention were “poor,” his insight was “poor,” and it was noted that Petitioner could not follow a train of thought. *Id.* In March 2008, an EOP progress report noted Petitioner still needed “continuous redirection to the task at hand.” *Id.* at 296.  On April 10, 2008, a clinician noted Petitioner's speech was pressured, his affect was angry/agitated, his concentration, attention and memory were poor, and his insight and judgment were poor. *Id.* at 49.  In April, July, and October 2008, a clinician noted Petitioner suffers from depression and agitation. *Id.* at 45-48.  Specifically, in July 2008, although a clinician noted Petitioner's appearance and hygiene were within normal limits, he also indicated Petitioner was delusional. *Id.* at 261.  In September 2008, Petitioner stated that he is “always wrestling [with] something in my mind.” *Id.* at 236.  However, on October 29, 2008, a clinician reported Petitioner's insight and judgment were fair. *Id.* at 222.  In a December 2008 progress note, a clinician stated, “[n]o evidence of acute psychosis at this time.”  (Lodgment 14 at 220.)

In September 2009, Petitioner's thought process was noted as within normal limits, while his cognition, fund of information, and intellectual functioning were not within normal limits. (Lodgment 11 at 27.)  The report further noted Petitioner had a history of depression, had no GED and only an eighth grade education. *Id.*

In a February 2010 report, a clinician requested another emergency IDTT referral. (Lodgment 11 at 18.)  Several reports from staff indicated Petitioner had been acting bizarre by talking to himself and appearing disorganized and expressing thoughts unrelated to his current situation. *Id.* Another clinician noted Petitioner talked very rapidly about various religious issues and tried to take his clothes off in the medical office.  (Lodgment 14 at 208.)  Petitioner appeared disoriented, tangential and made statements like, “I think like an ant; I think like a spider.” *Id.* His fund of information and intellectual functioning were not within normal limits, his insight and judgment were “poor,” and his thought process was “tangential.”  (Lodgment 11 at 19.) An IDTT clinician indicated Petitioner would benefit from a “comprehensive treatment program with an emphasis on skill development and increased programming and structured treatment environment. (Lodgment 14 at 41.)  Petitioner was diagnosed with psychotic disorder and bipolar disorder, and

1   was ultimately recommended for a higher level of care.  *Id.* at 208.  An April 2010 EOP group

2   progress report indicates Petitioner had difficulty staying on the group topic and needed constant

3   verbal redirection to allow peers to share in discussion.  *Id.* at 178.  A May 2010 report indicated

4   orientation and cognition as within normal limits, but characterized Petitioner's thought process as

5   "circumstantial."  (Lodgment 1 at 13.)

6        The medical records also report Petitioner's Global Assessment of Functioning Score[2] (GAF)

7   between 1999 and 2010.  In March 1999, Petitioner's GAF score fluctuated from 60 to 30 in a matter

8   of day.  (Lodgment 12 at 4.)  In April 1999, his score fluctuated between 43 and 35.  *Id.* at 3, 9.

9   Between August and November, his score ranged between 40 and 42.  *Id.*

10       From February 2000 through December 2000, Petitioner's GAF score fell between 42 and

11  45.  (Lodgment 12 at 82, 143.)  In 2001, his score varied between 43 and 45.  *Id.* at 115, 110, 98.  In

12  2002, his score was 44.  (Lodgment 13 at 38.)  In 2003, his score varied between 45 and 47.  *Id.* at

13  166.  From February through June 2004, his score was 47, in July it increased to 50, and in October

14  it increased again to 55.  (Lodgment 11 at 41, 35.)

15       However, in November 2005, Petitioner's score dropped back down to 47.  (Lodgment 11 at

16  31.)

17       A year later, in November 2006, his score increased to 60.  (Lodgment 14 at 59.)

18       In January 2008, Petitioner's score plummeted down to 49.  (Lodgment 14 at 5.)

19       A year later, in September 2009, Petitioner's score reached an all time high of 65.

20  (Lodgment 11 at 28.)  Only five months later, in February 2010, his score dropped to 49.  *Id.* at 17.

21  Three months later, after his current federal habeas petition was filed by a jailhouse "lawyer,"

22  Petitioner's score dropped to 40.  *Id.* at 14.

23                      *b.    Dr. DeFrancesco's Declaration*

24       In support of his Response in Opposition to the Motion to Dismiss, Petitioner attached a

25

26       [2]  A Global Assessment of Functioning score is the clinician's judgment of the individual's overall level of
    functioning.  It is rated with respect only to psychological, social, and occupational functioning, without regard to
    impairments in functioning due to physical or environmental limitations.  DIAGNOSTIC AND STATISTICAL MANUAL
27  OF MENTAL DISORDERS, at 32 (4th Ed. 2000).  Scores in the range from 50 to 60 indicate "Moderate symptoms...or
    moderate difficulty in social, occupational, or school functioning."  Scores from 40 to 50 indicate "Serious symptoms...or
28  any serious impairment in social, occupational, or school functioning."  Scores from 30 to 40 indicate "Some impairment in
    reality testing or communication...or major impairment in several areas, such as work or school, family relations, judgment,
    thinking, or mood."  *Id.*

declaration of Dr. David DeFrancesco, PhD, a licensed psychologist in the State of California.  (ECF No. 40-1 at 1-8).  Dr. DeFrancesco concluded that Petitioner has had a long history of mental health problems after reviewing nearly one thousand medical records and mental health progress reports pertaining to Petitioner.  *Id.* at 2.  Specifically, Dr. DeFrancesco stated that based on his review of Petitioner's infirmity from 1991 through 2011, "it is clear that [Petitioner] would not have been able to file a petition without assistance."  *Id.* at 8.  Also, Dr. DeFrancesco stated that Petitioner "has struggled with serious mental health issues for over a decade, which prevented him from timely filing his habeas petition in federal court."  *Id.*

### 3.    Analysis

As discussed thoroughly in the Court's previous Report and Recommendation, the statute of limitation in Petitioner's case began to run on December 29, 1998.  (ECF No. 13 at 3.)  Accordingly, absent tolling, Petitioner had until December 29, 1999 to file a timely federal habeas petition.  However, Petitioner did not file the instant Petition until April 26, 2010, nearly 11 years after the limitations period ran.  Notwithstanding this delay, the Court finds equitable tolling is warranted for the entirety of the pertinent time period, thereby making the petition timely.

Preliminarily, the Court takes note that not every month between December 1998 and April 2010 can be accounted for in Petitioner's medical records.  However, the Court does not consider the lack of medical records as a failure on Petitioner's part to carry his burden in establishing that the doctrine of equitable tolling applies to him. *See Raspberry*, 448 F.3d at 1153.  Rather, as highlighted by the Supreme Court in *Brown v. Plata*, 131 S. Ct. 1910, 1924 (2011),[3] the Court considers the lack of medical records in Petitioner's file as a reflection of the inadequate mental health care inmates receive in the California prison system.  Therefore, rather than presume Petitioner was mentally competent during the months without medical records, the Court will examine the severity of Petitioner's mental illness based upon the totality of the records before the Court.

First, equitable tolling is warranted because a review of the medical and psychiatric records indicates Petitioner's mental illness rendered him unable to personally prepare a habeas petition and

---

[3]  In *Brown*, the Supreme Court noted mentally ill prisoners in California "do not receive minimal, adequate care." 131 S. Ct. At 1924.  Prison overpopulation, which was at about 200% of designed capacity,  has caused the demand for mental health care in California's prison system to overwhelm the mental health staff.  *Id.*

effectuate its filing during the pertinent time period.  Specifically, close inspection of the medical records indicates Petitioner has not been stable since 1999. Although the records indicate Petitioner responded well to treatment at times, it is clear from the records Petitioner consistently struggled with schizophrenia, paranoia, psychotropic medication side effects, low levels of intellectual functioning, and auditory and visual hallucinations between 1999 and 2010.  Indeed, out of the nearly one thousand pages of medical records, spanning almost 11 years of Petitioner's mental health history, records from only *five* months definitely indicate Petitioner may have been capable of filing a habeas petition or seeking assistance.[4]  Conversely, records from March 1999-September 2004, December 2004-February 2005, April 2005-August 2008, November 2008, and January 2009-April 2010 reveal Petitioner's consistent struggle with severe mental impairment.  Therefore, Petitioner's medical records reveal that only <u>five months</u> of the statute of limitations ran between December 1998 and April 2010.

Further, Petitioner's GAF scores and Dr. De Francesco's declaration support the contention that he was not stable between 1999 and 2010.  With few exceptions, Petitioner's GAF scores from 1999 until 2010 indicate serious impairment.  Between February 2000 through June 2004, Petitioner's GAF score fluctuated between 40 and 50, indicating serious impairment.  From 2004 through 2010, Petitioner fluctuated from having moderate difficulty in social, occupational, or school functioning to having serious impairment.  These fluctuations corroborate the medical records in demonstrating Petitioner was unstable during the pertinent time period.

Respondent contends the Court should not toll the time between the beginning of 2005 through November 2005 because Petitioner was taken out of EOP and placed in Clinical Case Management ("CCM"), a lower level of care.  (ECF 43 at 5.)  However, in accordance with the Supreme Court's finding in *Brown v. Plata* that the demand for mental health care in California's prison system has overwhelmed mental health staff, that a mentally ill prisoner could face a "four to five year gap" before receiving treatment, or become "trapped in lower levels of treatment," the Court does not presume Petitioner's temporary placement in CCM was due to his alleged improved

---

[4]  Only reports from the following five months showed most assessments as within normal limits, without any reports to the contrary: (1) October 2004 (Lodgment 11 at 37); (2) November 2004 (Lodgment 11 at 44); (3) March 2005 (Lodgment 13 at 58); (4) October 2008 (Lodgment 14 at 222); and (5) December 2008 (Lodgment 14 at 220).

mental health as opposed to a variety of other factors, such as prison overcrowding.  131 S. Ct. at 1926.  Rather, the Court finds that between January and November 2005, only March 2005[5] does not warrant equitable tolling because a report unequivocally states that while taking medication, Petitioner's speech was normal and well-organized, he had no psychotic symptoms, and he exhibited no abnormal movements.  (Lodgment 13 at 58.)  On the other hand, reports from July and August 2005 (the only other months between January and November 2005 accounted for in the medical records) indicate Petitioner experienced side effects as a result of his medication, his speech was pressured, he was anxious, and he experienced hallucinations and persecutory delusions.  (Lodgment 13 at 49-55.)  By November 2005, Petitioner was placed back in EOP because he continued to suffer from paranoia, anxiety, and depression.  (Lodgment 11 at 31.)  Thus, the Court finds the only month Petitioner spent in CCM not warranting equitable tolling is March 2005.

Respondent also contends Petitioner is not entitled to equitable tolling after he filed his state petition on October 16, 2009, which would amount to nearly six months of the limitations period, because the very act of filing that petition shows he was able to file and his impairment did not cause delay.  (ECF No. 42 at 4.)  It is important to note that Petitioner's jailhouse "lawyer," not Petitioner himself, filed the state habeas petition asserting that Petitioner "has mental health issues and still suffers from them.  Petitioner suffers from lapses of consciousness [and] memory, paranoi[d] schizophrenia and Petitioner is diagnosed with [a] mental disorder."  (Lodgment 9 at 3.)  In fact, in September 2009, only one month before filing his state petition, Petitioner's fund of information, and intellectual functioning were reported as not within normal limits.  (Lodgment 11 at 27.)  And by February 2010, only four months after filing the state petition, a clinician requested an emergency IDTT and Petitioner's fund of information and intellectual functioning were reported as not within normal limits, his insight and judgment were poor, and his thought process tangential.  (Lodgment 11 at 18-19.)  Also, an April 2010 EOP group progress report indicates Petitioner had difficulty staying on the group topic, and needed constant verbal redirection.  (Lodgment 14 at 178.)  Therefore, at a minimum, the Court finds equitable tolling is warranted for February and April 2010, so that only four months of the limitations period expired after Petitioner filed his state habeas.

---

[5]  As discussed previously, March 2005 is one of the five months that does not warrant equitable tolling.

1   However, even assuming the Court concludes the full six months of the limitations period expired

2   after Petitioner filed his state habeas, the petition is still timely.  As discussed previously,

3   Petitioner's medical records reveal that only <u>five months</u> of the statute of limitations ran between

4   December 1998 and April 2010.  The expiration of <u>six months</u> of the limitations period after

5   Petitioner filed his state petition in addition to the expiration of <u>five months</u> discussed earlier only

6   amounts to <u>eleven months</u> between December 1998 and April 2010 that do not warrant equitable

7   tolling.  Accordingly, based upon a thorough review of Petitioner's medical records, the Court finds

8   Petitioner's "mental state rendered him unable to personally prepare a habeas petition and effectuate

9   its filing," thereby satisfying the first *Bills* prong.  *Bills*, 628 F.3d at 1100.

10          Further, Petitioner satisfies the second *Bills* prong because under the totality of the

11   circumstances, particularly in light of his mental incompetence, Petitioner was diligent.  *Bills*, 628

12   F.3d at 1100.  In February 2001, Petitioner received a letter from the Social Security Administration

13   advising him they would send the records he requested so long as he provided them the name of a

14   responsible person who could review the records with him to ensure he understood them.

15   (Lodgment 12 at 109.)  Petitioner asked a clinician if he would write the letter for him, and the

16   clinician responded that he would review the materials with Petitioner but would not write the letter

17   for him.  *Id.*  At this point, Petitioner indicated he felt confused and frustrated because he needed to

18   write a letter in order to get the records he needed.  *Id.* at 108.  The clinician noted Petitioner was

19   confused by the request, easily overwhelmed, and had difficulty understanding explanations or

20   recommendations on how to effectively deal with things that occur.  *Id.*  A subsequent report noted

21   that after working on the letter for several weeks, Petitioner was excited and relieved that he was

22   finally able to mail a simple letter to the Social Security Administration.  *Id.* at 105.  In a January

23   2006 report, Petitioner stated he was going to the law library to work on his case, even though the

24   same report noted his thought content was not within normal limits, his speech was "pressured," and

25   his insight and judgment were noted as poor.  (Lodgment 14 at 349.)

26          A review of the mental records reveals Petitioner diligently pursued his claims to the extent

27   he could.  Petitioner's consistent struggles with schizophrenia, paranoia, psychotropic medication

28   side effects, low levels of intellectual functioning, and auditory and visual hallucinations between

1999 and 2010 made even the simplest of tasks, such as writing a letter, an unquestionable

challenge.  Completing the legal research necessary to prepare a habeas petition and then writing a petition is challenging for most attorneys, so that such an endeavor for someone like Petitioner, who only has an eighth grade education and suffers from severe mental impairment, is near impossible.  In fact, the evidence shows Petitioner did not have the mental competence necessary to file a petition and consequently relied on a jailhouse "lawyer" to file both his state and federal petitions.  Therefore, within the meaning of the second *Bills* prong,  Petitioner "show[ed] diligence in pursuing the claims to the extent he could understand them, " but that his mental impairment made it impossible to meet the filing deadline under the totality of the circumstances.  *Bills*, 628 F.3d at 1100-01.

Accordingly, because Petitioner satisfies both prongs of the *Bills* test, the Court hereby RECOMMENDS Respondent's Motion to Dismiss on the basis of timeliness be **DENIED.**

**B.      Procedural Default**

Respondent contends Petitioner's claims are procedurally defaulted because the California Supreme Court denied the petition on April 14, 2010, with citations indicating that it determined Petitioner's claims to be untimely.  (ECF No. 23-1, referring to Lodgment 10, citing *In re Robbins*, 18 Cal. 4th at 780.

Petitioner asserts his claims are not procedurally defaulted because *Martin v. Walker*, __ U.S.__ _, 131 S. Ct. 1120 (2011) is not controlling.  (ECF No. 40 at 19-24.)  Specifically, Petitioner asserts extending *Martin* to this case would necessarily ignore Petitioner's serious mental impairment, thereby violating the requirement that petitions of *pro se* petitioners alleging incompetence be construed liberally, as well as offend due process and notions of fundamental fairness and substantial justice.  *Id.*

When a state court rejects a federal claim based upon a violation of a state procedural rule which is adequate to support the judgment and independent of federal law, a habeas petitioner has procedurally defaulted his claim.  *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).  A state procedural rule is "independent" if it is not interwoven with federal law.  *LaCrosse v. Kernan*, 244 F.3d 702, 704 (9th Cir. 2001).  A state procedural rule is "adequate" if it is "clear, consistently applied, and well-established" at the time of the default.  *Calderon v. United States District Court*, 96 F.3d 1126, 1129 (9th Cir. 1996).

1    Respondent has the initial burden of pleading as an affirmative defense that Petitioner's

2    failure to satisfy a state procedural bar forecloses federal habeas review.  *Bennett v. Mueller*, 322

3    F.3d 573, 586 (9th Cir. 2003).  Once Respondent has asserted the existence of an adequate and

4    independent state procedural ground as an affirmative defense, the burden shifts to Petitioner who

5    must place this defense at issue by "asserting specific factual allegations that demonstrate the

6    inadequacy of the state procedure, including citation to authority demonstrating inconsistent

7    application of the rule."  *Id.* at 586.  If Petitioner meets his burden to place the defense at issue, the

8    ultimate burden to demonstrate the adequacy of a state procedural bar is on Respondent.  *Id.*

9    Respondent has pleaded that the California Supreme Court, in the last reasoned state court

10   decision, clearly and expressly stated the denial of Petitioner's claims rested on a state procedural

11   bar.  (Lodgment 10.)  Indeed, the California Supreme Court cited *In re Robbins*, (1998) 18 Cal. 4th

12   at 780, which held that an untimely petition will be considered on the merits only if a petitioner

13   establishes good cause for the delay.  *Id.*  Therefore, the burden has shifted to Petitioner to challenge

14   the independence or adequacy of the procedural bar.  *Bennett*, 332 F.3d at 586.

15   In *Walker v. Martin*, the petitioner presented claims alleging ineffective assistance of

16   counsel to the California Supreme Court nearly five years after his conviction became final, without

17   providing any reason for the long delay, and, as here, the petition was denied with citations to *In re*

18   *Robbins*, 18 Cal.4th 770, 780 (1998).  *Walker*, 131 S.Ct. at 1124.  The *Walker* Court recognized that

19   *Robbins* is cited by the California Supreme Court, and in particular page 780 of the *Robbins* opinion

20   (which was cited here), when that court signals "that a habeas petition is denied as untimely."  *Id.*

21   That is, the California Supreme Court signaled that the petitioner had failed to seek habeas relief

22   without "substantial delay" as "measured from the time the petitioner or counsel knew, or reasonably

23   should have known, of the information offered in support of the claim and the legal basis for the

24   claim," and had failed to carry "the burden of establishing (I) absence of delay, (ii) good cause for

25   the delay, or (iii) that the claim falls within an exception to the bar of timeliness."  *Walker*, 131 S.Ct.

26   at 1125, quoting *Robbins*, 18 Cal.4th at 780, 787.  Ultimately the Court held that California's

27   timeliness rule is clearly established and consistently applied.  *Walker*, 131 S.Ct. at 1128-31.

28   Here, Petitioner cannot successfully challenge the independence of California's timeliness

bar.  The Ninth Circuit has held that California's timeliness bar is independent, and this Court is

1   bound by that holding.  *See Bennett v. Mueller*, 322 F.3d 573, 581 (9th Cir. 2003) ("We conclude

2   that because the California untimeliness rule is not interwoven with federal law, it is an independent

3   state procedural ground, as expressed in *Clark/Robbins*.")

4          However, Petitioner successfully challenges the adequacy of California's timeliness rule.

5   The adequacy of a state procedural rule "is not within the State's prerogative finally to decide; rather,

6   adequacy 'is itself a federal question.'"  *Lee v. Kemma*, 534 U.S. 362, 375 (2002), quoting *Douglas*

7   *v. Alabama*, 380 U.S. 415, 422 (1965).  Although *Walker* found California's timeliness rule to be

8   clearly established and consistently applied, the *Walker* Court noted that a petitioner might be able

9   to show the rule to be inadequate in his or her own case by showing that "the California Supreme

10  Court exercised its discretion in a surprising or unfair manner."  *Walker*, 131 S.Ct. at 1130 ("A state

11  ground, no doubt, may be found inadequate when discretion has been exercised to impose novel and

12  unforeseeable requirements without fair or substantial support in prior state law.") (citation and

13  internal quotation marks omitted); *see also Kemma*, 534 U.S. at 376 (recognizing exceptions where

14  "exorbitant application of a generally sound rule renders the state ground inadequate to stop

15  consideration of a federal question.")

16         Petitioner contends it was unfair for the California Supreme Court to impose a procedural bar

17  here because Petitioner's "lengthy history of mental illness distinguishes him from *Martin* and

18  constitutes good cause for his substantial delay in filing his habeas petitions."  (ECF No. 40 at 24.)

19  In fact, there is substantial evidence of mental impairment before, during, and after the statute of

20  limitations period in this case, as discussed at great length above.  Further, the necessity of a

21  jailhouse "lawyer" and the near eleven year delay in filing his petitions highlights Petitioner's total

22  inability to comply with California's timeliness requirements.  Therefore, the California Supreme

23  Court's imposition of a timeliness bar unfairly interferes with Petitioner's right to have his

24  constitutional claims heard.  *See Walker*, 131 S.Ct. at 1130.  To rule otherwise would be to deny

25  numerous prisoners suffering from severe mental illness a fair and full opportunity to present their

26  claims to federal courts.  Moreover, allowing California's timeliness rule to preclude Petitioner from

27  having his federal claims reviewed on the merits would not only offend notions of fundamental

28  fairness, it would also defeat the purpose of allowing equitable tolling based on mental

    incompetence.

Based on the foregoing, the Court finds California's timeliness bar, as applied to Petitioner, is inadequate. Accordingly, the Court RECOMMENDS Respondent's Motion to Dismiss on the basis of procedural default be **DENIED**.

### IV. CONCLUSION

After thorough review of the record in this case and based on the foregoing, the Court hereby RECOMMENDS Respondent's Motion to Dismiss based on timeliness and procedural default be **DENIED**.

This Report and Recommendation of the undersigned Magistrate Judge is submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1) (1994).  Any party may file written objections with the Court and serve a copy on all parties on or before **February 23, 2012.**  The document should be captioned "Objections to Report and Recommendation."  Any reply to the objections shall be served and filed on or before **March 5, 2012.**  The parties are further advised that failure to file objections within the specified time may waive the right to appeal the district court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED:  February 3, 2012

LOUISA S PORTER
United States Magistrate Judge